

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00258-CR

_____

CHRISTIAN MICHAEL TYRRELL, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1411740D

Before Walker, Kerr, and Pittman, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Christian Michael Tyrrell raises two issues challenging his conviction for capital murder of a person under ten years of age[1]—A.L., the two-year-old son of Appellant's girlfriend Jessica Langlais. Jessica was eventually indicted for the same offense and invoked her Fifth Amendment right to not testify at Appellant's trial. Appellant argues that the trial court's admission of Jessica's out-of-court statements made at the hospital to police investigator Amelia Heise violated his Confrontation Clause rights. Appellant also argues that the trial court's admission of Jessica's out-of-court statements made at the hospital to Heise and to A.L.'s biological father, Ulises Herrera, violated the Texas Rules of Evidence. We will assume error with respect to both of Appellant's issues; nonetheless, because application of the requisite harm analyses establishes that any error was not harmful, we will affirm.

### II. FACTUAL BACKGROUND

#### A. Events Leading to A.L.'s Death

A.L. was born on March 18, 2013. Although Herrera and Jessica were separated when A.L. was born, they briefly reconciled and moved in together in May 2014. Herrera testified that almost immediately thereafter, he and Jessica began fighting and that "she had this thing where she would love to pick a fight with me just

---

[1]*See* Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2018).

so she could leave the house . . . ." Herrera explained that when Jessica would go out or to work, he would watch A.L., and when he had to work, a friend, John Winkler, would generally watch A.L.[2] Shortly after moving in together, Herrera and Jessica broke up and stopped living together.

In October 2014, Jessica began a romantic relationship with Appellant and he moved in with her and A.L. At the time Appellant moved in with Jessica, A.L. was not staying with them every day, but as time went on, A.L. would stay with Appellant and Jessica on most days. Appellant, who has a biological son from a prior relationship, said that he loved A.L. like his own son.

Herrera testified that in December 2014, at the time when Appellant was living with Jessica and A.L., Winkler brought A.L. to Herrera's house to show him a "big handprint" and "bruise" on A.L.'s leg. Herrera had never seen anything like that before on A.L. Winkler testified that on December 26, 2014, when Appellant came to pick up A.L., A.L. ran back to Winkler in fear. Winkler said that A.L. had never acted like that before, so Appellant left without taking A.L. and Winkler instead dropped A.L. off with Jessica.

According to Appellant, he and Jessica began fighting over her drinking and partying. Appellant testified that he wanted to spend time with Jessica and A.L.—like

---

[2]Winkler is the stepfather of Jessica's ex-boyfriend.

3

a family—but that Jessica just wanted to go out and drink when she had time off of work.

On March 18, 2015, MedStar was dispatched to a residence in Fort Worth after receiving a report of a traumatic injury involving a child. When the paramedics arrived, Appellant was standing outside with the door open. He informed the paramedics that A.L. was in the back bedroom, but he did not provide any information about the severity of A.L.'s injuries. Appellant informed the paramedics that he was not A.L.'s biological father.

The paramedics found A.L. lying on his back with his arms at his sides. He was barely breathing—only about four to six times per minute. A.L.'s eyes were open, but they were nonresponsive and appeared to be covered by film. One of the paramedics who arrived at the scene, Amber Branham, testified that based on her evaluation, these injuries were consistent with brain injury or brain bleeding, and that A.L. appeared to be in the last stages of life. Branham also recognized that A.L. was covered in bruises around his eyes and ears and had swelling on the side of his head, which Branham believed was an indication of a possible skull fracture. Thus, the paramedics administered a valve mask, placed A.L. on a spinal backboard and in a C-collar to prevent further spinal injuries, and started an IV.

Appellant told Branham that A.L. had fallen from his crib the night before and had been acting funny before he suddenly collapsed, at which time Appellant called 9-1-1. When the paramedics informed Appellant that they needed to take A.L. to

4

Cook Children's Hospital immediately, Appellant left the room to call Jessica, who was working. Branham testified that Appellant was frantically telling Jessica that A.L. needed to be taken to the hospital but that he was otherwise relaxed. Appellant declined an offer to ride in the ambulance because he said he needed to pick up Jessica from work on the way to the hospital.[3]

When A.L. arrived at Cook Children's, Christi Thornhill, a nurse practitioner and director of trauma services and CARE Team at Cook Children's, examined him. She saw that A.L. was covered in bruises and that he had significant swelling and bruising to his head and face. She determined that A.L. needed immediate intubation with a ventilator. At trial, Nurse Thornhill explained that typical toddler-bruises usually occur on shins, knees, elbows, forearms, chins, and foreheads because toddlers tend to move in a forward motion; therefore, the bruises behind A.L.'s ear, jawline, cheek, and chest were atypical toddler-bruises and were indicative of physical abuse. Nurse Thornhill testified that A.L.'s injuries were consistent with being struck by or against a hard surface and not from falling out of a bed or playpen.

---

[3]The State asserts, "This crime's conspiratorial nature is highlighted by the fact that, rather than accompany A.L. in the ambulance, the appellant insisted on picking up Ms. Jessica and driving her to the hospital – an ample opportunity for them to get their stories straight." However, Appellant testified that he and Jessica had only one car at the time and that he and A.L. had dropped her off at work that morning, so he had to go pick Jessica up at her work, which was "literally on the way to that hospital."

Dave Donahue, a pediatric neurosurgeon at Cook Children's, testified that he examined A.L. on March 18, 2015. Dr. Donahue testified that although he had been informed that A.L.'s injuries were caused by falling from a toddler bed, the injuries were inconsistent with that kind of fall. Instead, Dr. Donahue testified that after examining A.L. and reviewing his CT scans—in which Dr. Donahue recognized a very wide skull fracture down the base of A.L.'s skull as well as other smaller fractures and swelling in his brain—he concluded that A.L.'s injuries could have been caused by slamming A.L.'s head against a hard surface and that his injuries appeared to be inflicted rather than accidental. Dr. Donahue testified that A.L.'s brain looked like "ground glass" without any detailed structure.

Michael Hunt, a pediatric ophthalmologist, examined A.L.'s eyes on March 18, 2015. He testified that A.L.'s eyes were not responsive to light and did not demonstrate any physical responsiveness. Upon completing an internal examination, Dr. Hunt discovered multiple hemorrhages through both eyes, a separation of the retina from the back of A.L.'s right eye, and a folding of the retina in the back of A.L.'s left eye. Dr. Hunt testified that these injuries could not have been caused by falling from a playpen and that they could have been caused by striking A.L. against a hard wall.

Despite the efforts of the medical professionals and staff, A.L. died the next day on March 19, 2015. It was the day after his second birthday. Herrera testified that he was a decisionmaker to take A.L. off of life support and to donate his organs.

6

Dr. Richard Fries, a deputy medical examiner with the Tarrant County Medical Examiner's Office, performed an autopsy on A.L. Dr. Fries's examination revealed three distinct bruises on A.L.'s head: (1) a four-inch bruise on the right side of his face and right eye; (2) a one-and-a-half inch bruise around his left eye; and (3) a bruise extending from his right ear to scalp. Dr. Fries testified that A.L.'s bruises were uncommon because toddlers typically bruise on their shins, knees, elbows, and hands. Dr. Fries also testified that A.L. had two skull fractures on the back of his head: (1) a 13.5 cm fracture extending to the base of his skull at foramen magnum—the hole in the base of the skull through which the brain stem and spinal cord extend—and (2) a 9.6 cm fracture on the right side of his head. Dr. Fries explained that the foramen magnum is probably the most difficult bone in the skull to break because of its thickness and placement in a well-protected area. Dr. Fries testified that A.L.'s injuries could have been sustained by striking him with or against a hard surface and determined the cause of his death was a blunt force trauma to his head.

### B. Appellant and Jessica Provided Inconsistent Accounts of the Events Leading Up to A.L.'s Death

When Appellant and Jessica had arrived at Cook Children's on March 18, 2015, Nurse Thornhill asked them for A.L.'s medical history and to identify the last time A.L. was acting normal so that she could better understand how his injuries had occurred. At trial, Nurse Thornhill testified that Jessica provided the following timeline:

7

- On March 17, 2015, she put A.L. in his playpen for a timeout;

- A.L. must have fallen when he tried to climb out of the playpen because when Jessica returned, A.L. was lying on the floor face up and was unable to move his neck;

- A.L. was sleepy and had eye swelling, so she did an internet search for information about head injuries;

- Jessica watched A.L. for the next three to four hours and A.L. vomited once, which Jessica determined to be normal based on her internet research;

- She put A.L. to bed with her and Appellant;

- When A.L. woke up the next morning, his face was black and blue and swollen, so Jessica gave him Tylenol and he acted normal;

- She gave A.L. a banana, but he vomited it up so she gave him a cracker; and

- Jessica left for work at about 10:30 a.m. and left A.L. in Appellant's care, and then she received a phone call from Appellant around 1:00 p.m. that A.L. had a seizure and stopped breathing and that an ambulance had been called.

    Nurse Thornhill testified that Appellant provided the following timeline:

- Appellant and Jessica had been finding strange bruises on A.L. and he had been getting out of his crib, so they moved A.L. to a toddler bed, but the strange bruises continued;

- On March 17, 2015, between 5:00 and 6:00 p.m., Appellant put A.L. in his playpen for a nap because he was being fussy;

- Appellant went back to check on A.L. about thirty minutes later and he found A.L. lying on his back but responsive;

- A.L. was sleepy and vomited once, but Appellant's internet research showed this was a normal symptom;

8

- A.L. slept with Jessica and Appellant and A.L. woke up a few times fussing but that was normal;

- The next morning, A.L. was acting normal and alert so they gave him some Pedialyte and water; and

- After Jessica left for work, A.L. was sitting on the floor playing with his toy truck when suddenly, his eyes rolled into the back of his head, he arched his back, and began gasping for breath, so Appellant called 9-1-1.

Detective Amy Heise, who worked for the Fort Worth Police Department's crimes against children unit, also arrived at the hospital on March 17, 2015. Detective Heise testified that upon arriving at Cook Children's, she spoke to Nurse Thornhill, who informed Heise that there were two adults—Appellant and Jessica—who were involved in the timeline of when A.L. was injured. Detective Heise stated that this information from Nurse Thornhill guided the next steps in her investigation.

Detective Heise spoke to Jessica in the waiting room, and Heise said that at that time Jessica was not in custody and that she indicated a willingness to talk.[4] Detective Heise testified that Jessica had provided the following timeline:

- A.L. was acting normal on the morning of March 17, 2015;

- A.L. went down for a nap in his toddler bed around 1:00 p.m.;

- A.L. woke up from his nap and had lunch but did not swallow his food;

---

[4]At trial, when Detective Heise was asked to testify regarding what Jessica had told her, Appellant's counsel objected on the grounds that Jessica's out-of-court statements were inadmissible hearsay and barred by the Confrontation Clause because Jessica was unavailable to be cross-examined. The trial court overruled the objections and permitted Appellant's counsel to have a running objection.

9

- Appellant then took A.L. to his playpen for a timeout;

- When she went back in the room, A.L. was on his back on the floor outside of his playpen with his legs up and feet against the playpen;

- A.L. had bruising on his head, cheek, and neck;

- A.L.'s eyes kept rolling to the back of his head and he was acting sleepy;

- Jessica then began Googling "toddler head injuries";

- A.L. expressed pain when trying to lift his head;

- A.L. vomited around 10:00 p.m.;

- A.L. could not hold his head up;

- Appellant watched A.L. during the night while Jessica slept;

- A.L. seemed more responsive the next morning, so Jessica fed him a banana, which caused him to vomit;

- Appellant drove Jessica to work with A.L. in his car seat;

- A.L.'s eyes were open during the ride, but he was not talking, and his head was resting against the side of the car seat;

- Jessica received a telephone call at approximately 1:00 p.m. from Appellant telling her that A.L. had experienced a seizure and was being taken to the hospital.

Detective Heise testified that Jessica was crying during their conversation.

Detective Heise then spoke to Appellant in a separate family waiting area at the

hospital. She testified that Appellant was not in custody and that he expressed a

10

willingness to speak to her. Detective Heise said that Appellant told her the following:

- A.L. got bruised by falling out of his toddler bed;

- A.L. was fine and could walk;

- A.L. could respond to questions;

- A.L. was able to play with his toys;

- A.L. was fine until he suddenly had a seizure.

Detective Heise testified that Appellant's description of how A.L. fell out of his toddler bed and his statements that A.L. was not symptomatic until he had a seizure were "markedly different" than Jessica's description of the events, so Heise went back to speak to Jessica again.

Detective Heise testified that upon her later investigation of the residence, she found one of the walls in a spare bedroom had been indented. She also saw two other wall patches, which led Heise to suspect that other incidents of striking A.L.'s head or body against a wall had occurred. Trisa Crutcher, a forensic DNA scientist for the State, testified that she tested a piece of wallboard cut out from the spare bedroom and that she concluded that Appellant could not be excluded as a DNA contributor to the piece of wallboard. Heise testified that based on her entire investigation, her opinion was that A.L. was killed by being struck against the bedroom wall.

11

Herrera testified that he saw A.L. about two weeks before A.L. died and that at that time A.L. was healthy and able to walk and run and had no vision or medical problems. Herrera said Jessica called him from the hospital on March 18, 2015. When he arrived, Herrera was taken into "interrogation." Herrera testified that Jessica had told him the following version of the events leading to A.L.'s injuries[5]:

- On March 17, 2015, A.L. was in his playpen for a time-out when he fell out;

- A.L. was hurt and "not responding right";

- She Googled "seizures for a two-year-old" and tried to give him Tylenol;

- The next morning, March 18, 2015, A.L. was more responsive and able to eat some banana and she left him with Appellant when Jessica went to work; and

- A.L. was not moving and could not move his neck but was recovering and seemed fine and was "playful."

Herrera explained that Jessica would use the playpen "quite a bit" and he never saw A.L. try to climb out, actually climb out, or fall out of the playpen.

---

[5]At trial, the prosecutor and Appellant's trial counsel approached the bench for a conference because the State indicated it intended to ask Herrera about Jessica's statements to him at the hospital concerning A.L.'s injuries. Appellant's counsel objected to the questions as eliciting inadmissible hearsay under the rules of evidence. The trial court overruled Appellant's objection and ruled Jessica's statements to Herrera were admissible as statements by a co-conspirator in furtherance of a conspiracy.

12

### C. Appellant is Indicted Shortly After A.L.'s Death, Jessica is Indicted Before Appellant's Trial, Jessica Pleads the Fifth and Refuses to Testify, and Appellant is Convicted of Capital Murder

A Tarrant County grand jury indicted Appellant on July 17, 2015 for intentionally or knowingly causing the death of A.L., a person under the age of ten, by striking him on or with a hard surface. Approximately two months before trial a grand jury indicted Jessica for the same offense.

From August 1, 2017 through August 10, 2017, Appellant's case was tried to a jury. At trial, Appellant attempted to call Jessica as a witness, and Jessica was questioned outside of the presence of the jury. Jessica refused to testify, asserting her Fifth Amendment right to avoid self-incrimination. Jessica also refused to answer whether she would testify on behalf of the State without a "deal."

Appellant chose to testify. He explained that when he arrived at the hospital on March 18, 2015, with Jessica, after he parked the car, he was greeted by three hospital personnel who asked him what had happened to A.L. Appellant testified that he had told them that A.L. was injured in his playpen after being put down for a nap. After Appellant joined Jessica in the waiting room, she told him that she had told the CARE team that A.L. had fallen in the playpen during a timeout, so Jessica began to worry that they would wonder why their stories were different.

Appellant conceded that at that point he made a decision to lie in order to protect Jessica. When Detective Heise and a CPS investigator came to talk to Appellant, he acknowledged that he did not take advantage of his "opportunity to

13

save the day." After he went with Detective Heise to Alliance for Children, he had another opportunity to "tell a different story," but again Appellant did not and instead maintained his story that A.L.'s injuries occurred by falling out of the playpen.

In closing argument, the Prosecutor stated, in part, as follows:

I told you last week that you're going to hear a lot about Jessica, and you did because Christian Tyrrell got up here and told all of you that for the past two years he has been covering for Jessica, and we'll get to why that makes no sense in a second. But know this, Jessica's day is coming. No one at this table thinks that Jessica is innocent of anything. She is responsible for her son's death just as much as he is, but it's his day today. He sits in that chair today, and that's what you're here to decide. Because Jessica's day is coming, and she'll have her chance to sit in that chair, but today it's his day.

. . . .

*We brought you those statements that Jessica made because those two were in it together.* Because once his head got slammed into that wall, it was time to cover up. Because they knew they could not take [A.L.] to the hospital. They knew that they would be in trouble, and he told you that. He made that choice. They focus -- he said the focus was on [A.L.]. That's what he told you yesterday. But make no mistake, the focus was on themselves. The focus was on themselves so they wouldn't get in anymore trouble. *They were in it together . . . .* [Emphasis added.]

The jury returned a guilty verdict for the offense of capital murder of a person under ten years of age. Tex. Penal Code Ann. § 19.03(a)(8). The jury also returned a finding of "true" beyond a reasonable doubt on a deadly-weapon question. The trial court assessed punishment as life imprisonment without parole. Appellant perfected this appeal.

14

### III. ISSUES PRESENTED

Appellant raises two issues. First, Appellant contends that the trial court erred by overruling his objection to Detective Heise's testimony about Jessica's statements to her because admission of Jessica's out-of-court statements was barred by the Confrontation Clause. Second, Appellant contends that the trial court erred by overruling his objection to Detective Heise's testimony about Jessica's statements to her because the admission of Jessica's out-of-court statements violated the Texas Rules of Evidence. In his second issue, Appellant also contends that the trial court erred by overruling his objection to Herrera's testimony about Jessica's statements to him because the admission of Jessica's out-of-court statements violated the rules of evidence. Appellant asserts that each of these errors is reversible.

### IV. ASSUMING ERROR, THE ADMISSION OF THE OUT-OF-COURT STATEMENTS MADE BY JESSICA TO DETECTIVE HEISE OVER APPELLANT'S CONFRONTATION CLAUSE OBJECTION DID NOT CONSTITUTE REVERSIBLE ERROR

#### A. Applicable Law and Standard of Review

A trial court violates an accused's Sixth Amendment rights by admitting a hearsay statement made by a nontestifying declarant if the statement was testimonial and the accused lacked a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. 36, 59, 68, 124 S. Ct. 1354, 1374 (2004). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Del Carmen Hernandez v. State,* 273

S.W.3d 685, 687 (Tex. Crim. App. 2008) (citing *Crawford,* 541 U.S. at 59 n. 9); *see Langham v. State,* 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

We review an error in admitting evidence in violation of the Confrontation Clause under rule of appellate procedure 44.2(a), and we must reverse unless we can conclude beyond a reasonable doubt that the error did not contribute to the appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Williams v. State,* 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt, we consider (1) the importance of the evidence to the State's case; (2) whether the evidence was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the prosecution's case. *Langham,* 305 S.W.3d at 582; *Davis v. State,* 203 S.W.3d 845, 852 (Tex. Crim. App. 2006), *cert. denied,* 549 U.S. 1344 (2007) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986)). Courts may consider other factors as well, but the relevant inquiry is whether there is a reasonable possibility that the *Crawford* error, "within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue." *Davis,* 203 S.W.3d at 852–53 (quoting *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001)).

## B. Analysis

As explained below, assuming without deciding that Jessica's out-of-court statements to Detective Heise were testimonial and that their admission constituted a violation of Appellant's confrontation rights, that error was harmless beyond a reasonable doubt because, when viewed in light of the case as a whole, it did not contribute to Appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a): *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999).

### 1. Importance of Jessica's out-of-court statements to the State's case

The State's theory of the case was that Appellant murdered A.L. by striking him with or against a hard surface—i.e., the bedroom wall—and that Appellant and Jessica then tried to cover it up by making up a story that A.L. had fallen out of his playpen. This theory was dependent, in part, on evidence that Appellant provided inconsistent statements regarding the events leading up to A.L.'s death because he and Jessica had fabricated a story together to protect each other. In closing argument, the Prosecutor asserted, "We brought you those statements that [Jessica] made because those two were in it together. Because once [A.L's] head got slammed into that wall, it was time to cover up."

Thus, we conclude that Jessica's out-of-court statements were important for the State to advance its overall theory of the case.

## 2. Whether Jessica's out-of-court statements were cumulative of other evidence

Second, we consider whether the out-of-court statements were cumulative of other evidence. The State presented Nurse Thornhill, who testified similarly regarding Jessica's timeline of events leading up to A.L.'s death as the timeline Jessica provided Heise. Thus, Jessica's out-of-court statements recited by Heise were cumulative of unobjected-to testimony from Nurse Thornhill.

## 3. The presence or absence of corroborating or contradicting evidence

Third, we consider the presence or absence of corroborating or contradicting evidence on material points. Similar to the second factor, Heise's testimony concerning Jessica's out-of-court statements was corroborated by the testimony of Nurse Thornhill and Herrera. And Appellant, although providing some testimony contradicting Jessica's statements to Heise—ultimately testified that he had lied twice to Detective Heise about the timeline of events in order to protect Jessica. Thus, Jessica's statements were corroborated by other unobjected-to trial evidence.

## 4. Overall strength of the State's case

Finally, we consider the overall strength of the State's case. The strength of the State's case rests primarily in the fact that A.L. was undisputedly violently injured by blunt-force trauma to his head and neck and that Appellant was one of two people with him when these injuries occurred. Indeed, Nurse Thornhill, Dr. Donahue, Dr. Hunt, and Dr. Fries agreed that A.L.'s injuries were atypical for toddlers and appeared

18

to be the result of intentionally striking A.L. with or against a hard object. Herrera also testified that he had previously observed a hand print shaped bruise on A.L.'s leg—a type of injury that he had not seen on A.L. before Appellant moved in with Jessica. And Winkler testified that A.L. appeared afraid of Appellant and refused to leave with Appellant when Appellant came to pick him up. The State's forensic scientist explained that the major DNA profile on the wallboard in the spare bedroom belonged to A.L. and that Appellant could not be excluded as a minor contributor. Appellant's own version of the events leading up to A.L.'s death that he provided to Nurse Thornhill named himself as the person who had put A.L. in his playpen before A.L. allegedly fell out of it and explained his injuries. And finally, Appellant conceded that he had lied during the investigation to protect Jessica.

Having considered these factors, we hold that within the context of the entire trial, no reasonable possibility exists that the admission of Jessica's out-of-court statements to Detective Heise "'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue" at the guilt or punishment phases of Appellant's trial. *See Davis,* 203 S.W.3d at 852–53 (quoting *Wesbrook,* 29 S.W.3d at 119); *see also* Tex. R. App. P. 44.2(a). Accordingly, we overrule Appellant's first issue.

## V. ASSUMING ERROR, THE ADMISSION OF THE OUT-OF-COURT STATEMENTS MADE BY JESSICA TO DETECTIVE HEISE AND TO ULISES HERRERA OVER APPELLANT'S HEARSAY OBJECTION DID NOT CONSTITUTE REVERSIBLE ERROR

### A. Standard of Review and Applicable Law

We review a trial court's decision to admit an out-of-court statement over a hearsay objection for an abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). A trial court abuses its discretion if its decision is so clearly wrong that it lies outside of the zone of reasonable disagreement. *Id.* And we uphold a trial court's ruling if it is supported by the record and is correct under any theory of applicable law. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

The rules of evidence define "hearsay" as a statement, other than one made by the declarant while testifying at trial, that is offered into evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). "Generally, hearsay is not admissible except as provided by statute or the rules of evidence." *Logan v. State*, 71 S.W.3d 865, 867 (Tex. App.—Fort Worth 2002, pet. ref'd). Out-of-court statements of co-conspirators are excluded as hearsay and are admissible against other co-conspirators if the statements are made during the course of and in furtherance of the conspiracy. Tex. R. Evid. 801(e)(2)(E); *Arroyo v. State*, 239 S.W.3d 282, 290 (Tex. App.—Tyler 2007, pet. ref'd). To avail itself of the co-conspirator exception to the rule against hearsay, the State must demonstrate that (1) a conspiracy existed; (2) the statement was made during the course of and in furtherance of the conspiracy; and (3) both the declarant and appellant were members of the conspiracy. *Crum v. State*, 946 S.W.2d 349, 363 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd); *see also Meador v. State*, 812 S.W.2d 330, 332 (Tex. Crim. App. 1991) ("[T]he co-conspirator exception to the

hearsay rule is . . . not limited to prosecutions for conspiracy; it is a rule of evidence applicable to any offense.").

Assuming error, because the erroneous admission of hearsay testimony in violation of rules of evidence is not constitutional error, we disregard the error unless it affected the appellant's substantial right. Tex. R. App. P. 44.2(b); *see Rivera-Reyes v. State*, 252 S.W.3d 781, 786 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The admission of inadmissible hearsay constitutes non-constitutional error subject to the harm analysis rule under Texas Rule of Appellate Procedure 44.2(b)."). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions,

the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

## B. Analysis

The trial court expressly overruled Appellant's hearsay objection to Herrera's and to Heise's testimony about Jessica's out-of-court statements to them on the basis of the co-conspirator exception to hearsay. As explained above, the out-of-court statements from Jessica were important to the State's theory of the case and were highlighted by the Prosecutor during closing argument. However, as also explained above, not only was Detective Heise's and Herrera's testimony concerning Jessica's statements cumulative of the testimony of Nurse Thornhill, but Appellant himself conceded that he had spoken to Jessica about coordinating their stories before he proceeded to, admittedly, lie twice in providing a timeline of events leading to A.L.'s injuries. And Nurse Thornhill testified that Appellant had told her he was the one who put A.L. in his playpen before A.L. allegedly fell.

Moreover, the jury was able to consider the testimony of Nurse Thornhill, Dr. Donahue, Dr. Hunt, and Dr. Fries, who all agreed that A.L.'s injuries were atypical for toddlers and appeared to be the result of intentionally striking A.L. with or against a hard object. The jury could also consider Herrera's nonhearsay testimony that A.L. had suffered a hand print shaped bruise on his leg—a type of injury that he had not witnessed on A.L. prior to Appellant moving in with Jessica, and Winkler's testimony that A.L. exhibited fear of, and refused to leave with, Appellant when Appellant came

22

to pick him up. Finally, the jury could consider the State's forensic scientist's testimony that A.L.'s DNA was the major profile on the wallboard in the spare bedroom and that Appellant could not be excluded as a minor contributor.

Therefore, assuming without deciding that the trial court erred by admitting Jessica's out-of-court statements through the testimony of Detective Heise and Herrera under the co-conspirator exception to the hearsay rule, we hold that such error is not reversible because it did not affect a substantial right of Appellant—that is, it did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Boles v. State,* 598 S.W.2d 274, 279–81 (Tex. Crim. App. 1980) (holding no reversible error where facts complained of are admitted without objection by other competent evidence); *Byrd v. State*, No. 03-02-00625-CR, 2004 WL 162939, at *4 (Tex. App.—Austin Jan. 29, 2004) (mem. op., not designated for publication), *aff'd*, 187 S.W.3d 436 (Tex. Crim. App. 2005).

Accordingly, we overrule Appellant's second issue.

## VI. CONCLUSION

Having overruled Appellant's two issues, we affirm the judgment of the trial court.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 25, 2018

23